## In re KENTUCKY PROCESSING COMPANY fdba Fox Mining Corporation, Fox Processing Corporation, Fox Trucking Corporation, Fox Leasing Corporation, G & Y Coal Co., Inc., Adena Fuels, Inc., Adena Processing, Inc., Clemons Coal Company, Kentucky Mineral Processing, Inc., Debtor.

### No. 98–52437.

### United States Bankruptcy Court, E.D. Kentucky, Lexington.

### June 30, 2009.

---

28. *Id.*

### MEMORANDUM OPINION

JOE LEE, United States Bankruptcy Judge.

The issue is whether the parties commencing this chapter 11 case owe to the United States Trustee quarterly fees calculated pursuant to title 28 United States Code § 1930(a)(6). (See Documents # 301, 313). This is a question of law

requiring interpretation of applicable provisions of that statute.

**FINDINGS OF FACT:**

The parties commencing this case are the debtor and Charles Edward Yates, the sole shareholder of the debtor.

Mr Yates testified he caused Kentucky Processing Company to be incorporated as a Kentucky corporation in 1998 and caused nine corporations which he owned to be merged into this new corporate entity. This explains the rather long title to the case. After absorbing by merger the nine entities identified by the names under which they formerly did business, the debtor filed its chapter 11 proceeding in this court on September 25, 1998.

Mr Yates attributed the chapter 11 proceeding to cancellation of contract for the sale of coal at a favorable price of $7 to $8 per ton above the spot market price to a Japanese company. The offloading dock of the Japanese company was destroyed by an earthquake and collapsed into the ocean. This may refer to the earthquake that struck Kobe, Japan in January of 1995. Thereafter, the Japanese company obtained cancellation of the coal sale and purchase contract under a *force majeure* clause in the contract. The coal marketing operations of the debtor were not profitable thereafter.

Unsuccessful in its efforts to formulate a plan of reorganization, the debtor filed an amended plan, a liquidation plan, which provided for sale of all of the assets of the debtor by auction. This plan was confirmed by the court on May 31, 2001.

One property noticed for sale at auction was approximately 940 acres of land in Estill County, Kentucky, including the mining operations and improvements thereon. Previously, this property had been owned by South–East Coal Company, a major independent coal company that had been operating in Eastern Kentucky coal fields since 1912. That company filed for relief under chapter 11 in this court on October 17, 1990, Case No. 90–2183.

At the time of its filing, South–East was a defendant in the local Fayette Circuit Court (state court) in an action styled *Kentucky Utilities Company v. South–East Coal Company v. Citizens Fidelity Bank*, Case No. 84–CI–1703, in which Kentucky Utilities had been permitted to reject on economic grounds a contract to purchase coal from the debtor. Relief from stay was granted to permit South–East to exhaust its rights of appeal from the judgment of the trial court. Ultimately, the judgment of the trial court was upheld by the Kentucky Supreme Court. This doomed SouthEast's plan of reorganization.

South–East filed a plan of liquidation proposing sale of its assets not in the ordinary course of business. That plan was confirmed by the court.

DLX, Inc., a corporation formed for the purpose of purchasing the mining operations of South–East, purchased the aforementioned 940 acres and the improvements thereon formerly owned by South–East. On March 14, 1993, South–East, by its president, executed a deed conveying to DLX, Inc. the 940 acres, which consisted of several tracts of real property acquired by South–East over time as needed for the operation of the Calla Wash Plant and coal processing operation formerly conducted by South–East on the premises. The parties to this deed and this litigation agree a deed of correction may be in order, but correction of that deed is not relevant to the issue before the court.

A year later, on March 15, 1994, DLX, Inc., as lessor, entered into a lease agreement with Kentucky Processing Company, a partnership, identified in the record as Old KPC. The agreement gave Old KPC

an option to purchase the real and personal property covered by the lease. Apparently, with funding provided by Fox Trot Corporation or Fox Trot Properties, LLC, Kentucky Processing Company (Old KPC, the partnership) exercised the option to purchase the real and personal property encompassed by and described in the lease agreement and exhibits thereto.

Thereafter, Kentucky Processing Company, the partnership entity, morphed into a corporate entity bearing the same name, into which the nine other entities associated with the mining operations of Mr. Yates were merged. The new corporate entity, Kentucky Processing Company, is referred to in the record as New KPC. This new Kentucky Processing Company, which as previously noted, had then filed a petition for relief under chapter 11 in this court on September 25, 1998, was now proposing a plan of liquidation that provided for sale of all of its assets at auction, including the entire 940 acres purportedly leased from DLX, Inc., despite a dispute which had arisen over whether the lease agreement and option to purchase included an 86–acre parcel known as the Refuse Pile Tract, part of the 940 acres.

On July 20, 2001, the initial date on which the auction was scheduled to take place, DLX, Inc. filed an adversary proceeding. No. 01–5199, claiming it had retained ownership of the Refuse Pile Tract. The complaint asked that the auction sale be stayed until the court determined the question of ownership of the Refuse Pile Tract. The auction was allowed to proceed after the debtor and DLX agreed to read a notice at the auction detailing the litigation and disputed allegations with respect to ownership of the Refuse Pile Tract.

At the auction, Fox Trot Properties, LLC was the high bidder for the 940 acres, which it believed included the Refuse Pile Tract. The complaint in the adversary proceeding was amended to name Fox Trot Corporation as a defendant, and was further amended to name Fox Trot Properties, LLC as a defendant. These defendant Fox Trot entities were not among the nine entities merged into the new corporate entity, Kentucky Processing Company, the debtor herein.

Pursuant to an Agreed Order entered by the court in the adversary proceeding on November 27, 2002, it was stipulated that the debtor, Kentucky Processing Company, "is not interested in the outcome and is unlikely to participate" in the adversary proceeding initiated by DLX, Inc. and now defended by Fox Trot Corporation and Fox Trot Properties, LLC. In other words, the outcome of this litigation would not enhance or diminish the bankruptcy estate of the debtor. The Refuse Pile Tract still belonged to DLX, Inc. or had been purchased at the auction and paid for by the defendant Fox Trot Properties, LLC.

At the request of counsel for each of the non-debtor participants to this adversary proceeding, the debtor's Chapter 11 case, to which the adversary proceeding is related, was kept open pending a determination of the ownership of the Refuse Pile Tract. Counsel professed concern over whether the court would have jurisdiction to adjudicate the adversary proceeding if the case to which it is related were closed. That concern may have been unwarranted. *Porges v. Gruntal & Co., Inc. (In re Porges)*, 44 F.3d 159 (2d Cir.1995); *In re Skaggs*, 183 B.R. 129 (Bkrtcy.E.D.Ky. 1995). See also, Lander, *The Scope of "Related to Jurisdiction" After confirmation of a Plan in a Nonindividual Chapter 11 Case*, Norton Bankruptcy Law Adviser, February 2007, Issue No. 2.

In any event, by asserting a claim for quarterly fees, the United States Trustee

has submitted to the jurisdiction of the court with respect to the matter now before the court.

Following completion of a boundaries survey, discovery, and a trial, this court rendered a Memorandum Opinion holding that the 86–acre Refuse Pile Tract was not included in that part of the 940 acres leased to Old KPC or which Old KPC had an option to purchase, and further that DLX, Inc., having retained ownership of the Refuse Pile Tract, was entitled under state law to a right of access thereto via an existing right-of-way across the acreage acquired by Old KPC and subsequently by New KPC and the defendant Fox Trot entities. This court's opinion and order were entered May 4, 2005.

The decision of this court was affirmed by the district court on July 14, 2006, and by the Sixth Circuit Court of Appeals on June 18, 2008. There being no further appeals, the mandate of that court was issued on July 10.2008.

Meanwhile, counsel for the debtor had on October 22, 2001 filed with the court the debtor's Report of Distribution of Administrative Claim Escrow (Docket No. 285–1). It appears that after satisfaction of the claims of creditors holding security interests in the real and personal property sold at auction, deductions for the auctioneer's commission, and perhaps payment of some quarterly fees owed to the United States Trustee, although that is not clear from the record, there remained only $65,857.78 in escrow in the IOLTA account of counsel for the debtor, who, in the court's order confirming the debtor's amended plan of liquidation was designated as disbursing agent of monies placed in escrow for payment of administrative expense claims (Doc. No. 249). The amount placed in escrow was insufficient to pay administrative expense claims totaling $151,569.96, which had been allowed by the court. Counsel for the debtor negotiated settlements with these administrative expense claimants, all of whom agreed to accept a percentage payment in satisfaction of their claims. As disbursing agent, counsel for the debtor distributed from his IOLTA account all remaining funds of the bankruptcy estate in satisfaction of these claims.

Thereafter, the monthly reports filed by or in behalf of the debtor indicate no funds remained in the bankruptcy estate. There were no distributions from the bankruptcy estate after October 22, 2001. According to the record, quarterly fees owed to the United States Trustee were current through the quarter ending December 31, 2001.

On September 23, 2008 counsel for the debtor filed in behalf of the debtor a motion to close the debtor's Chapter 11 case and for other miscellaneous relief. The motion recited the debtor owes accrued U.S. Trustee fees in the amount of $4,550.00 through the quarter ending December 31, 2008 and sought closure of the Chapter 11 case prior to that date to stop the accrual of additional fees.

The case was closed prior to December 31, 2008. The order closing the case reserved judgement on and jurisdiction to decide questions related to payment of the quarterly fees claimed by the U.S. Trustee to be owed by the debtor.

It was alleged that when this chapter 11 case was kept open pending the outcome of the adversary proceeding between DLX, Inc. and the Fox Trot entities to determine ownership of the Refuse Pile Tract, the parties agreed that the losing party would pay any quarterly fees owed to the United States Trustee during the period of delay in resolving the adversary proceeding between these non-debtor parties (Doc. No. 303). The response of DLX, Inc. concurs

**456**

in the existence of such an agreement. The motion was noticed for hearing on November 5, 2008. At the hearing on November 5, 2008 the court on its own motion raised the question of whether quarterly fees were assessable for quarterly periods during which no distributions were made by the debtor (Doc. No.308). The hearing was continued until December 3, 2008 to afford the United States Trustee an opportunity to respond to the motion. There is no admission in the record or testimony or other evidence that Fox Trot Corporation or Fox Trot Properties LLC, the losing defendants in the adversary proceeding, agreed to pay the quarterly fees in question.

In any event, as previously noted, the statute obligates the parties initiating a chapter 11 case to pay the quarterly fees, if owed. In this instance that would be the debtor and Mr. Yates individually, the only and controlling shareholder of the debtor. That is why the court raised the question of whether the fees billed by the U.S. Trustee are actually owed under the factual circumstances presented by this case.

To summarize, no disbursements were made after the quarter ending December 31, 2001 and the date of the court's order closing the debtor's chapter 11 case, entered prior to the end of the last quarter of 2008.

By way of explanation, the 86–acre Refuse Pile Tract, the ownership of which was in dispute, is located in a bend of the Kentucky river. It had become a place of interest for possible construction of an electricity generating plant. According to counsel, due to advanced incineration techniques, there is enough burnable coal refuse on the 940 acres to operate such a generating plant for 30 years, which would make investment in such a plant profitable. The fight over ownership of the 86–acre Refuse Pile Tract seems never ending.

The Fox Trot entities have purchased judgment liens levied on that property by creditors of DLX, Inc.

## CONCLUSIONS OF LAW:

 Title 28 United States Code § 1930(a)(6) provides:

§ 1930. Bankruptcy fees

(a) The parties commencing a case under title 11 shall pay to the clerk of the district court or the clerk of the bankruptcy court, if one has been certified pursuant to section 156(b) of this title, the following filing fees:

(1) * * * * * *

(2) * * * * * *

(3) For a case commenced under chapter 11 of title 11 that does not concern a railroad, as so defined in section 101 of title 11, $1000.

(4) * * * * * *

(5) * * * * * *

(6) In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, which ever occurs first. The fee shall be $325 for each quarter in which disbursements total less than $15,000; * * * * * * * *

Prior to 2008 the fee for filling a chapter 11 case was $800 and the quarterly fee for each quarter in which disbursements total less than $15,000 was $250. These fees were increased to the present amounts shown above by the Consolidated Appropriations Act, 2008, Pub. Law 110–161 enacted Dec. 17, 2007. The higher $350 quarterly rate took effect in January 1, 2008.

The debtor's case was not "converted or dismissed." It has been "closed." There is agreement in the case law that quarterly

fees payable to the United States Trustee do not continue to accrue after a case is closed, which equates to dismissal.

Congress, by use of the plural term "disbursements" in § 1930(a)(6), bequeathed an element of confusion to those charged with interpreting how the statute is to be applied.

Title 1 GENERAL PROVISIONS, U.S.C.A. CHAPTER 1 RULES OF CONSTRUCTION, § 1 instructs that "words importing the singular include and apply to several persons, parties and things;" and that "words importing the plural include the singular;"

On the other hand, Title 11 U.S.C. § 102, Rules of construction, numbered paragraph (7) advises only that "(7) the singular includes the plural;" The instruction that words importing the plural include the singular is not included as a rule of construction for interpreting the provisions of title 11, the Bankruptcy Code.

The House and Senate Reports accompanying the Bankruptcy Reform Act of 1978 advise: "Paragraph (7) specifies that the singular includes the plural. The plural, however, generally does not include the singular, even when the item in question most often is found in plural quantities, in order to avoid the confusion possible if both rules applied. When an item is specified in the plural, the plural is intended." HR Rep. No 595 95th Cong., 1st Sess.315–316; Sen. Rep. No. 989, 95th Cong.2nd Sess. 27–28 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. These reports are reprinted in Appendix Volumes. 2 and 3 of Collier on Bankruptcy.

The history of the U.S. Trustee system, which began as a five-year pilot program in 18 of the 94 judicial districts, is set out in some detail in the 2008–2009 edition of the Norton Bankruptcy Code, pages 1666–1676. Prior to implementation of the pro-

gram nationally, the Attorney General, as mandated by statute, employed an independent consulting firm, Abt Associates, to evaluate the effectiveness of the program. Abt Associates' initial report of its study of the U.S. Trustee system was forwarded to the Attorney General and Congress in April 1983. Thereafter, the Abt study was updated from time to time. The 1985 Abt Report Update, page 17, under the heading *Self–Funding for U.S. Trustee Program*, states:

> Further, Chapter 11 debtors would pay an additional fee, on a quarterly basis, based upon their disbursements made during the quarter. *Only debtors who have made disbursements would pay this additional fee.* Italics supplied. See 2008–2009 Norton Bankruptcy Code, page 1670.

This was the original intent when quarterly fee assessments were instituted to help fund the U.S. Trustee System. The language of § 1930(a)(6) is completely in accord with the view that only debtors who have made disbursements would pay this additional fee. The minimum fee to be paid by debtors for each quarter in which disbursements "total" less than $15,000 has been increased from time to time, from $150, to $250, and effective January 1, 2008, to $350, to assist in the funding of the U.S. Trustee program. However, the periodic changes extending the period for assessment of fees or increasing the amount of quarterly fees to be assessed based on the amount of disbursements in a particular quarter do not evidence an intent to change the law to permit imposition and collection of such fees for quarters in which no disbursements are made. Surely Congress did not intend that zero disbursements be totaled, an exercise in futility.

Even if the court were persuaded, which it is not, that the general rule of construc-

458

tion set out in Title 1, Chapter 1, § 1, that the plural includes the singular, should apply, such interpretation would not support the result being practiced by the U.S. Trustee.

According to the dictionary, a singular means being only one. Zero does not rise to the level of being one. It is not a singular, and certainly it is not a plural. It is nothing, nil. It is an element of a set that when added to another element in the set produces the a sum identical with the element to which it is added. One cannot prove zero is less than $15,000 by subtracting zero from $15,000. The result is $15,000. The result is the same when zero is added to or divided into $15,000, or when $15,000 is multiplied by zero. Zero has no meaning until it is preceded or followed by a numeral that has meaning. The statute authorizes imposition of fees only for quarters in which there have been "disbursements." In arguing that zero disbursements obviously "total" less than $15,000, counsel for the U.S. Trustee apparently hasn't done the math.

The court acknowledges there are cases in which the courts have made such statements such as: "Thus, most reorganized debtors would have to pay only the minimum quarterly fee which is due when there are zero disbursements." See, *In re Celebrity Home Entertainment, Inc.,* Debtor, 210 F.3d 995 (9th Cir.2000). In that case the debtors had argued they owed no post confirmation fees, or alternatively that they owed only the minimum fee due when there are zero post-confirmation disbursements, apparently conceding they owed such fees for quarters in which no disbursements were made. In that context, the above-quoted statement in the 9th Circuit Court of Appeals opinion should not be viewed as a resolving the question of whether the fees were actually owed.

In *In re Sedro–Woolley Lumber Co., Inc.,* 209 B.R. 987 (Bkrtcy.W.D.Wash. 1997), the court stated at page 989, "This court concludes that the post-confirmation fees due the United States Trustee should be calculated on the basis of all disbursements made by the reorganized debtors. In cases where there have been no disbursements, the fee would be the minimum due under the schedule." There is no explanation of the basis for this conclusion, other than perhaps the fact the U.S. Trustee had billed the debtor for the minimum fee for quarters in which no disbursements were made.

In *In re Charles McAuley Adams,* 299 B.R. 540 (8th Cir. BAP 2003), a chapter 11 case filed by an individual debtor, the debtor was required to pay the minimum fee of $250 for the two quarters the case remained open. The source of the debtor's income is not discernable from the facts provided. It is not clear whether the debtor had made disbursements. Probably, if he had bought his own lunch, he had. The debtor admitted he was responsible for the $500 in fees requested by the U.S. Trustee. The court concluded: "Since the debtor's Chapter 11 case was pending during both the first and second quarters of 2003, he is liable for a minimum of $250.00 for each quarter and the debtor acknowledges this fact. It is not at all clear from the opinion whether the assessment was based on actual or no disbursements".

The circuit courts of appeals cases cited in the Memorandum of the United States Trustee, dealing with issues related to assessment of quarterly fees are factually distinguishable from the case under consideration by this court. Those cases involve disbursements by "reorganized" debtors made after confirmation of their plans of reorganization and before their cases were concluded. These cases arose

after § 1930(a)(6) was amended on January 26, 1996 to strike *"until a plan is confirmed"* as a cutoff date for assessment of quarterly fees. See *In re Aquatic Development Group, Inc.*, 352 F.3d 671 (2d Cir.2003). In that case the court recognized that the amount of quarterly fees owed is a "function of disbursements" and are "based on disbursements," not on a lack of disbursements, as is the practice of the U.S. Trustee in collecting the minimum quarterly fee for quarters in which there have been no disbursements.

 This court agrees with the teaching of the *Aquatic* case that the equitable powers of a bankruptcy court should not be used to foil collection of quarterly fees legitimately owed by Chapter 11 debtors. It does not follow that the court should refrain from relying on congressionally prescribed rules for the interpretation of federal statutes to forestall the practice of the U.S. Trustee of billing and attempting to collect quarterly fees that are not authorized by the provisions of § 1930(a)(6) of title 28 U.S.C.A.

"Total" as a verb means to determine the sum or total of; as a noun it means the quantity or amount reached by addition. No quantity or amount is manifest by zero or the addition of zeros, and as previously noted no lesser amount is produced when zero is subtracted from $15,000. It is clear to this court that no fees are owed for quarters in which there have been no disbursements. The first sentence of § 1930(a)(6) is qualified by the second sentence enumerating the fees to be charged when disbursements are actually made. If the collection of the minimum fee in Chapter 11 cases for quarters in which there are no distributions is essential to the self-funding of the U.S. Trustee system, the appropriate solution is to ask Congress to authorize collection of such fees by amendment of § 1930(a)(6),

not to misinterpret the language of the statute.

For the reasons stated above, it is the conclusion of the court that no fees are assessable against the debtor in this chapter 11 case for quarters in which no distributions were made by the debtor. Accordingly, the court finds the parties commencing this case owe no unpaid quarterly fees to the United States Trustee.